IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORI SHULTZ | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  22-3305 |
| Commissioner of Social Security | : | |

**<u>MEMORANDUM AND ORDER</u>**

ELIZABETH T. HEY, U.S.M.J.                    October 30, 2023

Lori Shultz ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence.

## I.  <u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed an application for DIB on January 3, 2019, alleging disability beginning on December 11, 2018, as a result of low back pain, nerve damage in her feet, arthritis in her hands, bulging discs in her lower back, neuropathy, radiculopathy, and rheumatoid arthritis.  <u>Tr.</u> at 68, 275, 279.[1]  Her application was denied at the initial level of review, <u>id.</u> at 82-93,[2] and on reconsideration.  <u>Id.</u> at 95-107.  At her

---

[1]To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured.  20 C.F.R. § 404.131(b).  The Certified Earning Record indicates and the ALJ found that Plaintiff was insured through December 31, 2023.  <u>Tr.</u> at 20, 260.

[2]According to a Disability Determination and Transmittal form (Form SSA-831) accompanying the August 19, 2019 initial determination explanation, that determination replaced and revised an earlier initial determination made on June 6, 2019.  <u>Tr.</u> at 81.

request, id. at 133-34, an administrative hearing was held before an ALJ on September

22, 2021, id. at 44-66.  On October 14, 2021, the ALJ issued an unfavorable decision,

finding that Plaintiff was not disabled.  Id. at 20-38.  The Appeals Council denied

Plaintiff's request for review on June 22, 2022, id. at 1-3, making the ALJ's October 14,

2021 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on August 18, 2022.  Doc. 1.  The

matter is now fully briefed and ripe for review.  Docs. 8-10.[3]

## II.   LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

---

The earlier, superseded initial determination is also contained in the administrative
record, see id. at 67-80, minus the Form SSA-831 cover page that accompanies the
August 19, 2019 initial determination.  Although the conclusions of the two initial
determinations differ – "Disabled" by operation of the Medical-Vocational Guidelines in
the first and "Not Disabled" in the second, id. at 79, 92 – the earlier determination is
captioned "OQR Review," and therefore constitutes an internal quality assurance review
rather than a formal initial determination.  See
https://secure.ssa.gov/poms.nsf/Inx/0204440004 (last visited Oct. 6, 2023).  The parties
do not dispute that the August 19, 2019 initial determination is the relevant determination
for purposes of this appeal.

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

scintilla." Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. __,

139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion'")

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary

review of legal issues.  Schaudeck, 181 F.3d at 431.

　　　To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

>    1.    Whether the claimant is currently engaged in substantially gainful activity ("SGA");
>
>    2.    If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
>    3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments" ["Listings"], 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
>    4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
>    5.    If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

Plaintiff was born on March 16, 1962, making her 56 years of age at the time of her alleged disability onset date (December 11, 2018) and 59 at the time of the ALJ's decision (October 14, 2021).  Tr. at 244, 275.  She is 5 feet, 6 inches tall, and weighs approximately 290 pounds.  Id. at 82, 279.  Plaintiff lives in a house with her ex-husband. Id. at 48, 49, 294.  She completed the twelfth grade and received specialty training as a realtor, id. at 49, 280, and has past relevant work as a legal secretary.  Id. at 49-50, 64, 280, 286.

### A.    ALJ's Findings and Plaintiff's Claims

The ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since December 11, 2018, her alleged disability onset date.  Tr. at 22.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of osteoarthritis of the hands, right greater than left, axonal polyneuropathy, lumbar degenerative disc disease ("DDD"), seronegative rheumatoid arthritis, and obesity.  Id.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 25.  In her RFC assessment, the ALJ determined that Plaintiff retains the RFC to perform sedentary work

with normal work breaks, except she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs but can never climb ladders/ropes/scaffolds; she is unlimited in reaching bilaterally; she can frequently handle, finger, and feel with the right dominant upper extremity; she is unlimited with the left upper extremity; and she can have occasional exposure to extreme cold, wetness, humidity, and vibration.  Id. at 28. Based on the testimony of a vocational expert ("VE"), the ALJ found at step four that Plaintiff could perform her past relevant work as a legal secretary.  Id. at 37.[4]  As a result, the ALJ concluded that Plaintiff was not disabled.  Id. at 38.

Plaintiff argues that the ALJ improperly evaluated the opinion of a consultative examiner, resulting in a flawed RFC determination.  Docs. 8 & 10.  Defendant responds that the ALJ's decision is supported by substantial evidence.  Doc. 9.

**B.** **Medical Evidence Summary**[5]

The record contains very few records prior to Plaintiff's alleged disability onset date (December 2018).[6]  On May 1, 2019, Saeed Bazel, M.D., performed a consultative internal medicine examination.  Tr. at 400-04.  Plaintiff complained of back pain first diagnosed in 2006, rheumatoid arthritis of her hands reportedly diagnosed by a family

---

[4]The ALJ did not make an alternative step-five finding.

[5]Plaintiff's claim relates to the ALJ's consideration of evidence related to her physical impairments.  Therefore, this medical evidence review will focus mainly on Plaintiff's physical condition.

[6]Prior records include a December 2009 lumbar MRI showing degenerative changes most pronounced at L5-S1 with a small central disc protrusion and a suggestion of an annular tear (tr. at 384) and pain management consultations by Lisa Nocera, M.D., in December 2012 and January 2013, addressing lumbar radiculopathy due to disc protrusion with epidural steroid injections.  Id. at 386-99.

medical doctor in 2018, and depression diagnosed in 2018 for which she was not taking any medication.  Id. at 400.  She reported daily lower back pain upon weight bearing, reaching an intensity of ten on a ten-point scale (10/10), and that she will take medication and rest for at least one hour to improve, and that the pain returns as soon as she gets up. Id.  She also reported that an x-ray of her back showed degenerative changes, and that she had treatment of her back pain in the past with physical therapy, three injections, and pain medication.  Id.  She had also been hospitalized for back pain in 2009.  Id. at 401.  She reported that her lower back pain radiated into her right foot, she experienced tingling and numbness in her feet, an EMG of her lower extremities showed radiculopathy of both legs, and that her radiculopathy and nerve damage was confirmed by a specialist in 2009. Id. at 400.  As for hand pain, Plaintiff reported daily pain, worse on the right, that it reaches an intensity of 7/10 after working, and that after taking pain medication and resting, the pain will return upon moving and typing.  Id.  Plaintiff reported that she uses a walker, transcutaneous electrical nerve stimulation (TENS) unit, and wheelchair as needed, but Dr. Bazel noted that she did not bring any devices to the examination.  Id. Plaintiff identified her current medications as Percocet[7] and Tylenol.  Id. at 401.  She reported to Dr. Bazel that she lives with a friend, cooks and cleans twice weekly, does laundry and goes shopping weekly, showers, bathes, and dresses daily with difficulty, and watches television and listens to the radio.  Id.

---

[7]Percocet is a combination of oxycodone, an opioid pain medication, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone, and it is used to relieve moderate to severe pain.  See https://www.drugs.com/percocet (last visited Oct. 13, 2023).

Upon examination, Plaintiff exhibited an abnormal gait, with shuffling and limping on walking, and she could not walk on heels and toes due to back pain and leg swelling.  Tr. at 402.  Squatting was limited to 30 percent for the same reason, while passive leg elevation to 40 degrees caused localized lower back pain.  Id.  Plaintiff got on and off the examination table and off the chair with some difficulty due to lower back pain, and she had pain over the lower back area in the lumbosacral region with limitation of movement.  Id.  Straight-leg raising ("SLR") was negative bilaterally, both seated and supine.  Id.[8]  She had edema[9] down both legs below the knees.  Id. at 403.  Her lumbar spine flexion-extension and bilateral lateral flexion were decreased, id. at 412, and otherwise her physical examination was within normal limits.  Id. at 411-13.  She exhibited bilateral hand pain, worse on the right, with "very minimal" joint deformity, intact hand and finger dexterity, and 4/5 grip strength bilaterally, and she could use zippers and buttons and had difficulty tying shoelaces.  Id. at 403.  Dr. Bazel diagnosed Plaintiff with chronic lower back pain with history of radiculopathy; hand arthritis, possibly due to rheumatoid arthritis; history of depression; obesity; leg edema; ambulatory dysfunction; and hand weakness.  Id.  An x-ray of Plaintiff's right hand

---

[8]The SLR test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees.  Johnson v. Colvin, Civ. No. 09-2228, 2014 WL 7408699, at *5 n.17 (M.D. Pa. Dec. 30, 2014) (citation omitted).

[9]Edema is defined as "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body."  Dorland's Illustrated Medication Dictionary, 32nd ed. 2012 ("DIMD"), at 593.

performed two days after Dr. Bazel's examination showed minimal degenerative joint disease with no acute fracture or dislocation.  Id. at 415.

Dr. Bazel also prepared a medical source statement of Plaintiff's ability to do work-related activities (physical) on May 1, 2019.  Tr. at 405-10.  The doctor opined that Plaintiff could lift/carry up to 10 pounds occasionally, identifying Plaintiff's back pain, neuropathy, hand pain, obesity, and leg edema as reasons for the limitation.  Id. at 405.  Plaintiff could sit for 1 hour, stand for 20 minutes, and walk for 30 minutes continuously, and in total for an 8-hour workday, she could sit 4 hours and stand and walk 1 hour each.  Id. at 406.  She does not require a cane to ambulate.  Id.  She could use either hand frequently and for all activities, and could use either foot to operate foot controls frequently.  Id. at 407.[10]  She could never climb ladders or scaffolds and could perform all other postural activities occasionally.  Id. at 408.  Finally, Dr. Bazel opined that Plaintiff could never tolerate exposure to unprotected heights and frequently tolerate exposure to all other environmental conditions, and that she could perform all identified activities, such as shopping, traveling independently and without assistance, maintain a reasonable pace when walking or using stairs, take public transportation, and care for personal needs, despite her physical impairments.  Id. at 409, 410.

On August 12, 2019, state agency medical consultant Chankun Chung, M.D., reviewed the medical record to evaluate Plaintiff's symptoms and complete an RFC as part of the initial disability determination.  Tr. at 87-91.  Dr. Chung opined that Plaintiff

---

[10]The form defines "Frequent" as "1/3 to 2/3" of the time.  Tr.. at 409.

could frequently lift and/or carry 10 pounds, stand and/or walk for a total of 4 hours and sit with normal breaks for a total of about 6 hours in an 8-hour workday, and was limited in both upper extremities in pushing and/or pulling due to pain in the hands, arthritis, and lumbar radiculopathy.  Id. at 88.  The doctor further opined that Plaintiff could occasionally climb, balance, and stoop, frequently kneel, crouch, and crawl, frequently handle/finger with the bilateral upper extremities, was unlimited in the ability to feel and to reach in any direction bilaterally, and needed to avoid concentrated exposure to extreme cold, wetness, humidity, and vibration.  Id. at 89-90.  Dr. Chung concluded that Plaintiff was not disabled.  Id. at 92.

Also on August 12, 2019, Plaintiff saw gynecologist Christopher S. Sliwinski for abnormal bleeding.  Tr. at 416-17.  The doctor reviewed Plaintiff's chronic problems, including obesity, intervertebral prolapse, spinal stenosis, and lumbar radiculopathy, noted that she walked without restrictions, and assessed her with postmenopausal bleeding and morbid obesity.  Id.  Plaintiff returned to Dr. Sliwinski on December 24, 2019, for a post-operative visit following a colonoscopy and endometrial biopsy procedure.  Tr. at 421-23.  The doctor noted the same chronic problems, id. at 421, and that Plaintiff walked without restrictions.  Id. at 422.  In his assessment/plan, Dr. Sliwinski stated that he reviewed pathology results with Plaintiff and no further treatment was necessary at that time, and advised that she could resume her regular activities.  Id. at 423.

On March 9, 2020, state agency medical consultant Hong S. Park, M.D., reviewed the medical record to evaluate Plaintiff's symptoms and assess Plaintiff's RFC as part of

the reconsideration determination.  Tr. at 101-05.  Dr. Park's conclusions were identical to those of Dr. Chung at the initial determination stage.  Id. at 102-04.  The doctor reported that Plaintiff did not have any additional alleged issues or prescriptions other than for gynecological treatment, and that she did not report having any gynecological problems since the December 24, 2019 follow up with Dr. Sliwinski.  Id. at 105.

On July 7, 2020, Plaintiff began treating with Irene J. Tan, M.D., a rheumatologist, on referral from John Moskaitis, M.D., her primary care physician.  Tr. at 436-46.  Plaintiff reported joint pain in her wrists (right worse than left) and fingers, and back pain, describing the pain as "achy" and rating it as 4/10.  Id. at 436.  Her joint pain improves with Tylenol for 4 hours, and repetitive use and typing makes it worse.  Id.  On physical examination, Plaintiff exhibited tender points elicited in the four quadrants of the body, with no clubbing, cyanosis, or pitting edema in her extremities, and normal findings in her bilateral shoulders, elbows, wrists, hips, upper legs, knees, and angles.  Id. at 438.  Plaintiff exhibited carpometacarpal ("CMC") tenderness and thumb interphalangeal ("IP") bony enlargement with pain in both hands, distal interphalangeal ("DIP") joints with bony enlargement and with pain, and paraspinous spasm and tenderness around L5-S1.  Id. at 439.[11]  Plaintiff's bilateral feet exhibited no tenderness or swelling, she had good grip strength in her bilateral hands, and moved all four

---

[11]CMC refers to the wrist joint.  DIMD at 298, 1424.  IP refers to the space between contiguous bones of the fingers or toes.  Id. at 950.  DIP refers to the furthest bone of a finger or toe, opposite of proximal interphalangeal ("PIP") which refer to the nearest bone of a finger or toe.  Id. at 555.

extremities with no Tinel's sign. Id.[12] Dr. Tan assessed Plaintiff with polyarthralgia,[13] classic primary osteoarthritis with thumb joint involvement of both hands, worse on the right, and back spasm due to back strain from abnormal weight. Id. at 439-42.[14] Dr. Tan counseled Plaintiff on the benefits of weight loss for back health. Id.

On July 27, 2020, Plaintiff saw Krikor Tufenkjian, M.D., of Global Neurosciences Institute, LLC., with a chief complaint of numbness and tingling in both feet, right more than left. Tr. at 511-13. Plaintiff reported a long history of lumbar spinal stenosis and that she has been taking Percocet three times per day for many years. Id. at 511. She stated that she was not aware of any symptoms in the upper extremities and had no radiating pain from the back at the time. Id. On physical examination, Plaintiff's extensor hallucis longus ("EHL") was 5- bilaterally, and abductor pollicis brevis ("ABP") muscle of in the hand 5- on the right; otherwise, all upper and lower extremity measurements were 5/5. Id. at 512.[15] Plaintiff exhibited diminished pinprick sensation to ankles bilaterally and reduced vibration sensation about 3 seconds on the right and 7

---

[12]Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve, indicating a partial lesion or the beginning regeneration of the nerve. DIMD at 1716.

[13]Polyarthralgia refers to pain in many joints. DIMD at 150, 1487.

[14]Dr. Tan also indicated a diagnosis of fibromyalgia. Tr. at 441. Because Plaintiff does not allege any error in the ALJ's identification of Plaintiff's impairments (which did not include fibromyalgia), I will not discuss that condition further.

[15]EHL is the long leg muscle that allows for the extension of the big toe. DIMD at 663, 818, 1073. The ABP is the short hand muscle that functions as an abductor of the thumb. Id. at 2, 250, 1486.

seconds on the left, with a normal gait and the ability to walk on heels and toes.  Id.  Dr. Tufenkjian assessed Plaintiff with peripheral neuropathy, noting that Plaintiff's presentation was consistent primarily with distal sensory more than motor polyneuropathy, with recent bloodwork indicative of undiagnosed diabetes.  Id. at 512-13.  The doctor did not add any medication for neuropathic pain because Plaintiff was already on an opiate for her lower back pain.  Id.

Plaintiff returned to Dr. Tan on August 4, 2020.  Tr. at 458-66.  Plaintiff stated that she had started swimming and was feeling slightly better in terms of her diffuse body ache, with continuing joint pain and a half-hour of morning stiffness affecting her wrists, hands, and feet.  Id. at 458.  Upon examination, Plaintiff exhibited tender points in all quadrants of the body, tenderness to palpation at the wrists and hand joints with Heberden's nodes[16] and CMC tenderness of both hands, and tenderness to palpation of the knees with crepitus.  Id. at 459.  Dr. Tan assessed Plaintiff with possible seronegative rheumatoid arthritis superimposed on primary osteoarthritis of the hands, polyarthralgia due to a combination of her negative rheumatoid arthritis and definite osteoarthritis of the hands, fibromyalgia syndrome, back spasm, osteoarthritis of the CMC joint of both hands, and vitamin D deficiency.  Id. at 459-64.  Dr. Tan added methotrexate for treatment of her pain.  Id. at 459.[17]

---

[16]Heberden's nodes are defined as "small hard nodules, formed usually at the distal [IP] joints of the fingers . . . and associated with [IP] osteoarthritis."  DIMD at 1280.

[17]Methotrexate is used to treat, among other things, rheumatoid arthritis. https://drugs.com/methotrexate.html (last visited Oct. 13, 2023).

On September 22, 2020, Plaintiff told Dr. Tan that she experienced whole-body stiffness and pain, as well as poor sleep and fatigue, and did not feel that methotrexate had helped. Tr. at 467. She reported walking for about a half-hour a few days per week. Id. Upon examination, Plaintiff again exhibited diffuse tender points in all quadrants of her body, with no tenderness to palpation of the bilateral shoulders, elbows, wrists, MCPs, PIPs or DIPs, and hand grasp 5/5, and no tenderness to palpation of knees, ankles, or metatarsophalangeal ("MTP") joints[18] without warmth or restricted range of motion. Id. at 468. Plaintiff appeared grossly intact neurologically and Tinel's sign was negative bilaterally. Id. Dr. Tan assessed Plaintiff with seronegative rheumatoid arthritis of the right hand, primary osteoarthritis of both hands, back spasm, and vitamin D deficiency. Id. at 468-69.

On November 13, 2020, Plaintiff followed up with Dr. Tufenkjian for peripheral neuropathy. Tr. at 514. Plaintiff reported the same symptoms of pain and numbness in the feet which seem to affect her ability to walk at times, and that she had not noticed much in terms of symptoms in the hands. Id. Upon examination, Plaintiff's APB measured 5- on the right, EHL measured 5- bilaterally, and ankle jerks were 1+ bilaterally; otherwise her examination results were normal. Id. at 515. Dr. Tufenkjian opined that Plaintiff's symptoms "are due to the peripheral neuropathy and any issues from the lower back would be secondary if of any relevance to it." Id. Plaintiff's EMG did not show any signs of medial or ulnar compression neuropathy in the right upper

---

[18]MTP joints refer to the joints between the tarsus (the bones of the foot) and the phalanges of the toes. DIMD at 1145, 1872.

extremity, but indicated extension of the peripheral neuropathy into the hands, "consistent with the findings on the exam today." Id.  The doctor also found no significant lumbosacral radicular involvement in the right lower extremity.  Id.  On March 11, 2021, Plaintiff told Dr. Tufenkjian that her symptoms were somewhat alleviated by leg elevation and Tylenol.  Tr. at 517-18.  Physical examination revealed bilateral corona phlebectasia,[19] intact pulses in her dorsal and posterior feet, posterior tibial pulses that could not be palpated, changes to Plaintiff's toes suggesting lymphedema,[20] and patchy areas of browning discoloration in her lower legs.  Id. at 517.

### C.   Other Evidence

At the hearing, Plaintiff testified that she stopped working as a legal secretary because she could no longer do the job, citing numbness in her feet which she attributed to her back problems, difficulty getting up and down, and aches in both hands such that "I could barely walk out of there at the end of the day."  Tr. at 50-51.[21]  She explained that she went from full-time to part-time and still could not perform the work.  Id. at 60.  She has problems walking and estimated that she can walk around a store for maybe a half-hour while holding onto the shopping cart, and then needs to get home and lie down.  Id. at 54-55.  She also has difficulty standing in one place because her back and both legs hurt, and estimated that she could stand a half-hour in a supermarket line and would then

---

[19]Phlebectasia is defined as permanent dilation of the veins.  DIMD at 1433.

[20]Lymphedema is defined as chronic edema of the limbs.  DIMD at 1084.

[21]Plaintiff testified that she had an x-ray taken of her right hand but not her left hand, because "the right is way worse."  Tr. at 53.  Later, she testified that her hands "are tingly and . . . painful if I use them."  Id. at 63.

14

have to bend over the cart.  Id. at 55. The numbness and pain in her feet occurs daily.  Id. at 63.  Plaintiff rated her pain as 8/10.  Id. at 58.

Plaintiff drives to and from the store and can dress herself, use zippers and cellphones and access the Internet, but stated that her cellphone is hard to hold and she has difficulty texting and gripping objects.  Tr. at 55, 56, 61-62.  Similarly, she still reads but has trouble holding a book.  Id. at 59.  She can sometimes do normal household chores, such as laundry and vacuuming with rest, but cannot cook except for simple things like sandwiches.  Id. at 58.  She uses both hands to hold a full cup of coffee, and it hurts to get a gallon of milk out of the refrigerator.  Id. at 59.  She cannot use a keyboard. Id. at 61.  Her pain is worse in the afternoons and evenings.  Id. at 57.

Plaintiff testified that she does not currently receive treatment for her back and takes Percocet and Tylenol to try to stop some of the pain, tr. at 51, and that Percocet helps but "not all the way."  Id. at 58.  She also tried physical therapy, which did not help. Id. at 56.  She sees a rheumatologist for treatment of her hands and stopped taking methotrexate because it seemed to make her hand pain worse.  Id. at 52.  She could not use a wheelchair because of her hand pain and sometimes uses a walker, such as to get to the bathroom some nights.  Id. at 62.  Surgery has been suggested for her legs, but not for her hands.  Id. at 54.[22]

---

[22]As the ALJ stated, tr. at 30, Plaintiff's testimony is similar to her Function Reports dated February and April 2019 and February 2020.  Id. at 294-301, 302-09, 330-37.  Plaintiff also completed an undated supplemental function questionnaire regarding her pain, indicating that it has "worsened significantly" since it began in 2006.  Id. at 338.

The ALJ also obtained testimony from a VE. Tr. at 64-65. The VE testified that Plaintiff's past relevant work as a legal secretary is skilled and sedentary work. Id. at 64. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience who could perform a range of light work with normal work breaks and who can balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally but can never climb ladders/ropes/scaffolds; is unlimited in reaching bilaterally; can handle, finger, and feel frequently with the right dominant upper extremity and is unlimited with the left upper extremity; and who can have occasional exposure to extreme cold, wetness, humidity, and vibration. Id. at 64.[23] The VE responded that such an individual could perform Plaintiff's past relevant work as a legal secretary. Id. at 64-65. With the added limitation that the individual could only occasionally handle, finger, and feel with the dominant right upper extremity, the VE testified that the work could not be performed. Id. at 65. Additionally, when the ALJ asked the VE whether other jobs existed to which the skilled work of a legal secretary would transfer that would allow for occasional handling, fingering, and feeling, the VE responded, "No." Id. at 65.

_____

[23]The ALJ later determined that Plaintiff could perform sedentary, rather than light, work with the same limitations. Tr. at 28. Because sedentary work is less strenuous than light work, this discrepancy did not prejudice Plaintiff.

**D.**     **Consideration of Plaintiff's Claim**

Plaintiff argues that the ALJ improperly evaluated the opinion of consultative

examiner Dr. Bazel, resulting in a flawed RFC determination.  Docs. 8 & 10.  Defendant

responds that the ALJ's decision is supported by substantial evidence.  Doc. 9.

As previously noted, the ALJ found that Plaintiff had the severe impairments of

osteoarthritis of the hands, right greater than left, axonal polyneuropathy, DDD,

seronegative rheumatoid arthritis, and obesity.  Tr. at 22.  Also as previously noted, the

ALJ found that Plaintiff retains the RFC to perform sedentary work with certain

limitations, and that she could perform her past relevant work as a legal secretary.  Id. at

28, 37.  In making these findings, the ALJ presented a narrative summary of the medical

record, summarized Plaintiff's testimony and function reports, and discussed the medical

opinion evidence.  Id. at 29-37.  Consideration of evidence is governed by regulations, in

effect since March 27, 2017, that focus on the persuasiveness of each medical opinion.

"We will not defer or give any specific evidentiary weight, including controlling weight,

to any medical opinion(s) or prior administrative medical finding(s), including those from

your medical sources."  20 C.F.R. § 404.1520c(a).[24]  The regulations list the factors to be

utilized in considering medical opinions:  supportability, consistency, treatment

relationship including the length and purpose of the treatment and frequency of

examinations, specialization, and other factors including familiarity with other evidence

---

[24]The regulations governing applications filed before March 27, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain  how she considered these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)); see also Plummer, 186 F.3d at 429 (same).

The RFC assessment is the most a claimant can do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  Id. § 404.1545(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  Rutherford, 399 F.3d at 554.  Rather, the RFC "must 'accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*."  Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984), and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)); Plummer, 186 F.3d at 431.  The ALJ must include all credibly established limitations in

18

the RFC and in the hypothetical posed to the VE.  Ramirez v. Barnhart, 372 F.3d 546,

550 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Here, following a narrative summary of Plaintiff's treatment records and medical

findings, the ALJ summarized the examination and diagnostic findings related to

Plaintiff's hands and upper extremities:

> [Plaintiff] endorsed very limited use of her hands.  She has
> been diagnosed with primary osteoarthritis of the hands, but
> the only workup was for the right hand.  There is no workup
> for the left hand problems and no studies.  There was only
> minimal degenerative change seen in the right hand on May
> 1, 2019 X-rays.  Rheumatologic examination of hands on July
> 7, 2020 revealed CMC tenderness with no signs of synovitis.
> There was also enlargement of the thumb and IP joint
> enlargement.  All other PIPs and DIPs were normal, and she
> had full range of motion of the MCP joints, with good grip
> strength.  Tinel's was negative.  Rheumatoid arthritis was
> ruled out by labs, so the diagnosis was seronegative
> rheumatoid arthritis.  In November 2020, examination
> findings were similar.  [Plaintiff] had generally full strength
> and no tenderness to palpation of the shoulders, elbows,
> wrists, MCPs, PIPS, or DIPs.  Tinel's was again negative
> bilaterally.  The upper extremity EMG was consistent with
> sensorimotor axonal polyneuropathy in the upper extremities
> but no entrapment neuropathies or lumbar radiculopathies.  At
> her consultative examination, [Plaintiff's] fine motor was
> intact with grip 4/5, and she was able to zip, button, and tie
> but had difficulty tying shoes.

Tr. at 33.  The ALJ next addressed the relevant diagnostic and examination findings

related to Plaintiff's complaints of back pain:

> Dr. Tan . . . noted normal hips, knees, ankles, thighs, and
> calves with full range of motion bilaterally and 5/5 motor
> strength ([id. at 436-77]).  Feet were not tender or swollen.
> [Plaintiff] endorsed debilitating back pain, but a 2009 lumbar
> MRI showed only mild degenerative changes at L4-5 and L5-
> S1 with no significant foraminal stenosis and mild canal

> stenosis at L5-S1.  EMG ruled our entrapment neuropathies in the lumbar spine as well as lumbar radiculopathies in the right lower extremity.  Tinel's, range of motion, sensation, and strength were generally normal throughout [office treatment records, id. at 508-21].  Her gait was always normal, but she said she required a cane and walker at times.  That is not in the treatment notes.  In fact, she is never seen using an assistive decide and gait is normal ([id. at 386-99, 508-21]).  She walks without restrictions . . . [id. at 416-30], she has normal gait, coordination, bulk, and tone, and she is able to walk on heels and toes (which she was unable to do at the 2019 consultative examination).  She has negative [SLR] ([id. at 400-15]).  No updated studies of the back have been recommended.

Id. at 33.  Finally, the ALJ discussed Plaintiff's lower extremities:

> With regard to [her] legs, she said she can barely walk; there is axonal polyneuropathy but no lumbar radiculopathy into the leg.  Neuropathic pain is controlled on medications.  Although she endorsed constant numbness and tingling in all extremities, lower extremity sensation and strength are always intact.  As strength, grip strength, bulk, tone, sensation, and reflexes are mostly always normal, Tinel's is negative, and gait and ambulation are normal, [Plaintiff's] impairments, including polyneuropathy, are severe, but the evidence does not support the degree of limitations endorsed by [Plaintiff].

Id.

As for Dr. Bazel specifically, the ALJ discussed his consultative examination findings and conclusions during her narrative summary of the medical evidence, and again when assessing the doctor's medical opinion:

> Consultative examiner Dr. Bazel stated on May 1, 2019 that [Plaintiff] did not bring an as-needed walker, [TENS] unit, or wheelchair with her that day for the examination ([tr. at 400]).  [Plaintiff] reported to Dr. Bazel that she cooked and cleaned twice weekly ([id. at 401]).   She did laundry and shopping once a week.  She showered, bathed, and dressed daily with

difficulty. . . .   Gait was abnormal, and [Plaintiff] shuffled and limped on walking ([id. at 402]).  She could not walk on heels and toes due to back pain and leg swelling.  Squatting was limited to 30 percent due to the same reason.  She got on and off the examination table, and she got off the chair with some difficulty due to lower back pain.  Her abdomen was obese.  Passive leg elevation to 40 degrees caused localized lower back pain.  She had pain over the lower back area in the lumbosacral region with limitation of movement.  There was 2+ pitting edema from the knees down on both sides ([id. at 403]).  She had pain in the bones of the right hand and to some extent on the left side with very minimal deformity of the joints.  Grip strength was 4/5 bilaterally.  She had difficulty tying shoelaces. . . .  Lumbar spine flexion-extension and bilateral lateral flexion was decreased ([id. at 412]).  Otherwise, this physical examination was within normal limits.  [SLR] was negative bilaterally both seated and supine, and stance was normal.  Dr. Bazel diagnosed [Plaintiff] with chronic lower back pain with history of radiculopathy; hand arthritis, possibly due to rheumatoid arthritis; history of depression; obesity; leg edema; ambulatory dysfunction; and hand weakness.  Right hand X-ray views showed minimal degenerative joint disease with no acute fracture or dislocation ([id. at 415]).

. . . .

Dr. Bazel prepared an opinion on May 1, 2019 in which he . . . found that [Plaintiff] could lift/carry up to 10 pounds occasionally (tr. at 405]).  He . . . opined that [Plaintiff] could sit for four hours, stand one hour, and walk one hour total in an eight-hour workday ([id. at 406]).  He . . . found that [Plaintiff] could use either hand frequently and either foot to operate foot controls frequently ([id. at 407]).  He . . . opined that [Plaintiff] could never climb ladders or scaffolds and could perform all other postural activities occasionally ([id. at 408]).  He . . . found that [Plaintiff] could tolerate no exposure to unprotected heights and frequent exposure to all other environmental conditions ([id. at 409]).  This opinion is somewhat supported by Dr. Bazel's consultative examination of [Plaintiff]. . . .  This opinion is not consistent with the other evidence of record . . . which shows [Plaintiff] to be less

> limited. . . .   Therefore, Dr. Bazel's opinion is found to be not
> persuasive.

Id. at 30-31, 34.

The ALJ summarized the remaining medical opinion evidence as follows:

> Obstetrician/gynecologist Dr. Sliwinski stated on December
> 24, 2019 that [Plaintiff] could resume regular activities ([tr. at
> 423]).  This opinion is well supported by Dr. Sliwinski's
> treatment records.  He stated that pathology results were
> reviewed, and no further treatment was necessary at that time,
> but [Plaintiff] was advised to call if she had any further
> bleeding episodes. . . .   This opinion is partially consistent
> with the other evidence of record.  As strength, grip strength,
> bulk, tone, sensation, and reflexes are mostly always normal,
> Tinel's is negative, and gait and ambulation are normal,
> [Plaintiff's] impairments, including polyneuropathy, are
> severe, but the evidence does not support the degree of
> limitations endorsed by [Plaintiff].  [Plaintiff] testified that
> her medications reduce her pain sometimes from 8 out of 10
> to 3 or 4 out of 10.  She said the pain is worse in the late
> afternoon and evening.  This evidence supports a finding that
> [Plaintiff] can perform sedentary work. . . .   Therefore, Dr.
> Sliwinski's opinion is found to be partially persuasive.
>
> . . . .
>
> Dr. Chung prepared an[] opinion on August 12, 2019 for 12
> months after the onset on December 10, 201[8] in which he or
> she found that [Plaintiff] could lift and/or carry 10 pounds
> occasionally or frequently, could stand and/or walk for a total
> of 4 hours, could sit for a total of about 6 hours in an 8-hour
> workday, was limited in both upper extremities in pushing
> and/or pulling, could climb, balance, and stoop occasionally,
> could kneel, crouch, and crawl frequently, could
> handle/finger frequently with the bilateral upper extremities,
> and needed to avoid concentrated exposure to extreme cold,
> wetness, humidity, and vibration ([id. at 88-90]).  This
> opinion is partially supported by Dr. Chung's explanation for
> his or her opinion, which was the same as the explanation [the
> doctor] provided for his or her June 4, 2019 opinion ([Id. at

75-76]).[25]  This opinion is also partially consistent with the other evidence of record. . . .  [T]his opinion is found to be partially persuasive.

. . . .

State agency medical consultant [Dr. Park] affirmed Dr. Chung's August 12, 2019 opinion on reconsideration . . . ([Id. at 102-04]).  This opinion is partially supported by Dr. Park's explanation for his or her opinion.  [The doctor] reported that [Plaintiff] did not have any additional alleged issues or prescriptions other than gynecological. . . .  [Plaintiff] had a December 24, 2019 follow up with no problems since.  No further treatment was necessary, and [Plaintiff] could resume regular activities. . . .  This opinion is also partially consistent with the other evidence of record. . . .  Therefore, Dr. Park's opinion is found to be partially persuasive.

Id. at 34-37.

In arguing that the ALJ improperly evaluated Dr. Bazel's opinion and thereby formulated a flawed RFC assessment, Plaintiff first argues that the ALJ mischaracterized Dr. Sliwinski's statement that Plaintiff "may resume [her] regular activities" as a relevant medical opinion.  Doc. 8 at 5-6; Doc. 10 at 1.  The regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your

---

[25]As previously noted, the June 2019 initial determination containing Dr. Chung's opinion was superseded by the August 12, 2019 initial determination containing the doctor's second opinion.  See tr. at 81; see also supra at 1 n.2.  Dr. Chung included the same explanation in both initial determinations.  Tr. at 76-77, 90-91.  According to the ALJ, Dr. Chung explained that Plaintiff reported chronic pain and was on Darvocet but drove a car, shopped in stores, walked for 25 -to- 30 minutes and then rested for 20 minutes, intermittently used a cane without a prescription, and underwent a December 2009 lumbar spine MRI which revealed degenerative changes most pronounced at L5-S1.  Tr. at 35 (citing id. at 76-77).  The ALJ also noted that Dr. Chung's explanation included a summary of Dr. Bazel's findings in his May 1, 2019 consultative examination of Plaintiff.  Id.

impairment(s) and whether you have one or more impairment-related limitations or restrictions."  20 C.F.R. § 404.1513(a)(2).   Although Dr. Sliwinski indicated that Plaintiff "may resume [her] regular activities," tr. at 423, he did so without any reference to what constituted Plaintiff's regular activities or how those activities related to her functional ability.  Moreover, Dr. Sliwinski treated Plaintiff for gynecological conditions which are not relevant to the allegedly disabling impairments, and the doctor's statement regarding Plaintiff's ability to "resume regular activities" occurred in the context of a follow-up to a colonoscopy and endometrial biopsy procedure.  Tr. at 421-23.  Under these circumstances, Dr. Sliwinski's statement cannot fairly be said to constitute a relevant medical opinion.

Nevertheless, Plaintiff fails to show how the ALJ's consideration of Dr. Sliwinski's statement requires remand.  While Dr. Sliwinski's statement does not constitute a relevant medical opinion, it nevertheless constitutes other medical evidence that the ALJ was required to consider in evaluating Plaintiff's claim.  See 20 C.F.R. § 404.1513(a)(3) ("Other medical evidence is evidence from a medical source that is not . . . a medical opinion.").  For example, during Plaintiff's pre- and post-operative visits to Dr. Sliwinski, the doctor reviewed Plaintiff's chronic obesity, intervertebral prolapse, spinal stenosis, and lumbar radiculopathy, and noted that she walked without restrictions and exhibited normal gait and ambulation -- observations which are clearly relevant to Plaintiff's alleged disabling conditions.  Tr. at 416, 422.  Moreover, there is no evidence that the ALJ unduly relied on Dr. Sliwinski's statement, but rather found the doctor's opinion to be only partially persuasive because it was partially consistent with other

evidence of record.  See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (reading ALJ's decision "as a whole").  The ALJ's lengthy review of the medical evidence identifies ample support for the ALJ's determination that Dr. Bazel's opinion was inconsistent with the record as a whole, and that Plaintiff retained the RFC for a range of sedentary work.

Similarly, I reject Plaintiff's related arguments that the ALJ mischaracterized Dr. Sliwinski's statements in an attempt to make Dr. Bazel's opinion appear inconsistent with other medical evidence of record, and that the ALJ's opinion lacks specificity and relies on conclusory statements, precluding meaningful judicial review of her decision. Whereas Plaintiff takes issue with the ALJ's statement that Dr Bazel's opinion was "inconsistent with the other evidence of record," calling such language "vague and conclusory," Doc. 8 at 7; Doc. 10 at 2-3, the ALJ's narrative summary of the medical record, as well as the portions of the ALJ's decision quoted at length above, contain specific objective diagnostic and examination findings that are inconsistent with Dr. Bazel's opinion.  For example, the ALJ noted the doctor's own findings that SLR tests were negative bilaterally both seated and supine, Plaintiff utilized no assistive devices and had normal stance, and x-rays of her right hand showed minimal degenerative changes.  Likewise, whereas Plaintiff argues that the ALJ erred by stating that Dr. Bazel's opinion was inconsistent with the evidence "discussed above," again citing lack of specificity precluding meaningful review, see Doc. 8 at 7; Doc. 10 at 3, the ALJ provided a comprehensive review of Plaintiff's treatment records earlier in her opinion. Moreover, the ALJ explicitly cited to multiple pieces of evidence in support of her

determination that Plaintiff could perform a range of sedentary work.  For example, the ALJ noted that Plaintiff was observed walking without restriction (tr. at 32, 416, 419); she reported that her 4/10 joint pain improved with Tylenol (id. at 31, 436); she exhibited no tenderness or swelling in her feet, good grip strength and movement in all four extremities with no Tinel's sign (id. at 31, 438-39); she reported in 2020 that she was not aware of any symptoms in her upper extremities and had no radiating pain from her back (id. at 31, 511); a physical examination which showed a reduction in several muscles of her hand and diminished sensation in her bilateral ankles otherwise showed full motor strength in the upper and lower extremities, normal gait, and the ability to walk on heels and toes (id. at 31, 512); and Plaintiff engaged in walking exercise for half an hour a few days per week (id. at 32, 467).  The ALJ also cited to diagnostic studies, including right hand x-rays taken on May 1, 2019, showing minimal degenerative changes with no acute fracture or dislocation (id. at 31, 415); an electrophysiology study performed in August 2020 showing sensorimotor and axonal polyneuropathy in the upper and lower extremities, with no evidence of entrapment neuropathies in the right upper extremity or lumbosacral radiculopathies in the right lower extremity (id. at 32, 508); and an EMG performed in November 2020 which indicated extension of peripheral neuropathy into the hands, with no signs of medial or ulnar compression neuropathy in the right upper extremity (id. at 32, 515).  The ALJ also identified specific treatment records and examination findings that did not support the extent of Plaintiff's self-reported limitations.  Id. at 33.  Therefore, it cannot fairly be said that the ALJ failed to articulate a basis for her determination.

26

Plaintiff also argues that Dr. Bazel's opinion was consistent with other evidence in the record, including other treating physicians and Plaintiff's hearing testimony.  Doc. 8 at 8-9; Doc. 10 at 3.  There is no question that Plaintiff has symptoms and limitations attributable to pain, and therefore the issue is whether the ALJ omitted or mischaracterized evidence or rejected opinion evidence for no reason or the wrong reason.  Rutherford, 399 F.3d at 554; Plummer, 186 F.3d at 429.  In light of the ALJ's detailed narrative summary of the medical evidence and her explanations regarding relevant examination findings and medical opinions, as quoted and discussed above, I do not find any such error.  I therefore decline Plaintiff's invitation to reevaluate the ALJ's consistency and supportability determinations regarding Dr. Bazel's opinion.

Finally, Plaintiff argues that the ALJ's errors in evaluating Dr. Bazel's opinion were not harmless, because had the ALJ evaluated the doctor's opinion differently, she would have found a more restrictive RFC precluding Plaintiff from being able to meet the demands of even sedentary work.  Doc. 8 at 9-10.  Because I find that the ALJ's consideration of Dr. Bazel's opinions comported with the regulations, I also reject this argument.

## V.   <u>CONCLUSION</u>

The ALJ properly evaluated the medical opinion evidence and properly assessed Plaintiff's RFC.  Therefore, I find that the ALJ's decision is supported by substantial evidence.  An appropriate Order follows.